## CHICAGO, R. I. & P. RY. CO. v. TATE.

No. 6380. Opinion Filed April 11, 1916.

(156 Pac. 1182.)

1. **NEGLIGENCE—Actions—Evidence.** The mere fact that an injury occurs carries with it no presumption of negligence. It is an affirmative fact for the injured party to establish that the defendant has been guilty of negligence.

2. **RAILROADS—Operation—Injuries to Person Near Track—Evidence.** The record examined, and **held,** that the evidence adduced at the trial reasonably tends to establish negligence on the part of the defendant, and that this negligence was the proximate cause of the injury complained of.

3. **TRIAL—Reception of Evidence—Discretion of Court.** The question of admissibility of statements as part of the **res gestae** should, in a great measure, be left to the determination of the trial court.

(Syllabus by Galbraith, C.)

*Error from District Court, Seminole County;*
*Frank Mathews, Assigned Judge.*

Action by Birdie Tate against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*W. H. Moore, C. O. Blake, R. J. Roberts, J. G. Gamble,* and *K. W. Shartel,* for plaintiff in error.

*E. L. Harris, S. S. Orwig,* and *T. S. Cobb,* for defendant in error.

Opinion by GALBRAITH, C. This action was commenced by Birdie Tate, as surviving widow, against the railroad company for damages resulting to herself and her infant child on account of the death of her husband, J. M. Tate. There was a trial to the court and a jury, and a verdict returned for the plaintiff for the full amount claimed, to wit, the sum of $2,995. A brief summary of the allegations of the petition is: That the deceased was a resident of the town of Seminole, Seminole county, Okla., and the proprietor of a restaurant; that the defendant company operated its line of railroad through Seminole, and it maintained a depot and station there, at which passenger trains stopped for the purpose of taking on and discharging passengers and mail; that on the 7th day of January, 1912, J. M. Tate left his place of business a short time before its west-bound passenger train was due, for the purpose of mailing a letter on that train, which carried the United States mail and received mail at the station; that while attempting to mail the letter, and while upon the platform of such station, the engine of the passenger train coming into the station struck a truck on which a number of crates of chickens were piled, and which had been carelessly left too near the track, and knocked the crates of chickens from the truck and drove one of the crates against the deceased, striking him on the left side and shoulder; that from this injury he contracted pneumonia and 13 days thereafter died; and that the negligence and carelessness of the railroad in driving the engine against the truck was the proximate cause of the injury and death of the deceased. The railroad company

answered by a general denial, and plea that the injury to the deceased, if any, was due entirely to his own negligence, and not the negligence or carelessness of the railroad company or its employees, and denied liability.

The evidence showed that the deceased was a man 34 years of age, and was in good health when he went to the train to mail the letter on the day of the accident, and that a few minutes after the train passed Seminole he returned to his place of business up town, complaining to his wife that he had been injured and was spitting blood, and he went to bed and was confined thereto from that time up until the day of his death, 13 days thereafter. None of the plaintiff's witnesses saw the coop strike the deceased, and none of the railroad company's employees were called as witnesses; but one of the plaintiff's witnesses, a drayman, who had gone to the station to meet the train, saw deceased a few minutes afterwards, and saw the engine of the passenger train strike the truck, and saw the chicken coop knocked off the truck, and when spoken to, the deceased said to the witness that one of the crates had hit him. When the deceased returned to his place of business, the plaintiff testified that he was complaining of pain in the left side and arm, and that there were mud prints of a box or crate on his back, shoulder, and left side; that on examination of his body she found no mark, but after his death she saw a bruised spot under the left shoulder. Two other witnesses testified that they saw the deceased at his place of business a short time after the accident, and he was complaining of pains in his side and left arm, and the deceased told them how the accident occurred; that a chicken crate was knocked against him by the engine of the passenger train,

and caused his injury. Although the deceased went to bed immediately and was in pain and distress, the regular physician was not called until five days thereafter. This doctor testified that when he reached the bedside of the deceased he found him in the first stage of pneumonia, that is, that he then had the initial chill, and that he treated him for lobular pneumonia from that time to the date of his death, eight days thereafter; that he examined the body of the deceased and found no marks thereon; that, while the treatment given the deceased was the usual treatment in pneumonia, his case was peculiar in some respects, in this, that he complained of pain in his left arm and side, and, again, the seat of the disease was the upper lobe of the left lung; that the lower lobe of the right lung was the usual seat of pneumonia, and, again, the case was peculiar on account of the character of the expectorations. Another physician testified that pneumonia is a germ disease, and that the pneumonia germs might be present in the body of a healthy person, and he might not have pneumonia, but, if he received an injury, a shock, or a wound on the body, something that would weaken his physical condition, this might cause the development of the disease, otherwise the resistance of the body would be sufficient to overcome the action of the germ, and he might escape the disease altogether, but a severe shock or wound on the body resulting in pain or physical weakness would lessen the power of resistance to such an extent that the germ would develop and pneumonia might result therefrom.

It is contended on behalf of plaintiff in error that there was no evidence that the coop hit the deceased; that it was error for the court to admit, over its objection, the testimony of the witness Brown that, when asked what

was the matter, the deceased said, "Yes, it hit me;" that this statement was not a part of the *res gestae,* but was purely narrative of past events, and, therefore, was not admissible, and the admission of this testimony was prejudicial error. The witness Brown, who was the drayman and· who went to the station on the morning of the accident for the purpose of meeting the train, as was his custom to do, testified, in part, as follows:

· "Q. Did you see any accident take place there with reference to Mr. Tate? A. Yes, sir. Q. State to the jury ·what it was. A. Well, I drove up there to the depot just before this morning train came through there, and after I had been there a few minutes I seen Mr.,,Tate, after the train came in, I seen Mr. Tate pass me, and· he just passed me when this accident occurred. Q. What accident? A. This train hit this trucks, and when they struck the trucks he went kind of past me, and I couldn't see him for a minute or two, and I ran up there to him and asked him if it hit him, and he said 'Yes, it hit me.' "

And, also:

"Q. What was the occurrence that happened there?. A. He had a letter in his hand that he started to mail. He seemed to be in a kind of a hurry, and he went right up past me toward the mail car. That's about all. Q. Did you see the truck there? A. Yes, sir. Q. Where was the truck located with reference to the railroad track? A. How do you mean? Q. Well, was it close to the track? A., I didn't pay much attention to it until after it was hit. Q. What hit it? ´ A. The train. Q. What part of· the train hit it? A. The engine. Q. When was it, before or after the train had stopped? A. Before, of course. Q. Just as the train was coming into the station? A. Yes, sir. Q. Where was this truck located, with reference to the station or depot? A. At the west end of the depot. Q. How far from the depot? A. Well, from twenty to thirty feet from the depot, out on the platform. Q. What was on the truck?

A. Three coops of chickens, I believe, was about all. Q. When the train hit this truck, what happened to the truck? A. It gave a right smart of a shove. Q. Did it turn the truck over? A. No, sir; it didn't turn the truck over. That is, it didn't turn the trucks over, but knocked the chicken coops off of them. Q. Did these coops hit anybody? A. Yes, sir; they hit this fellow Tate. Q. What part of them hit him? A. I don't know."

And, also:

"Q. Did you see any of the trainmen there at that time, railroad company? A. No, sir; the train crew were there, but I didn't pay much attention to them. Q. What were they doing there? A. Well, I went down there to meet that train in a dray wagon, and I didn't pay much attention to what they did. Q. Were you on the dray wagon when Mr. Tate was injured? A. No, sir. Q. Where were you? A. On the ground. Q. What direction were you from this truck when the train hit it? A. Kind of southwest from the truck. Q. The truck was located, then, between you and the railroad track, wasn't it? A. Yes, sir; when Mr. Tate passed by me. ` Q. When Mr. Tate passed you, which direction did he go? A. He was going towards the west. Q. Did that place him on the north of the truck? A. On the north side; yes, sir. Q. And he was going west at that time? A. Yes, sir. Q. Now, Mr. Brown, did your business require you to meet that train very often? A. Yes, sir; nearly every day I was down there. Q. I will ask you if you noticed on this particular day whether or not that train was coming into the depot faster or slower than usually was the custom? (Objected to. Objection overruled.) A. It looked to me like it was coming in a little faster than common."

We cannot agree with the contention of the plaintiff in error that the admission of this statement of the deceased that a crate hit him was prejudicial error. Whether the testimony was admissible as a part of the *res gestae*

was addressed largely to the discretion of the trial court. Mr. Chief Justice Kane, speaking for the court in *St. Louis & S. F. R. Co. v. Fick*, 52 Okla. 530, 149 Pac. 1126, said:

"This court seems to be committed to the doctrine that the admissibility of this class of testimony ought to be left, in a great measure, to the discretion of the trial court. *Smith v. C., R. I. & P. Ry. Co.*, 42 Okla. 577, 142 Pac. 398."

This being a discretionary matter with the trial court, we cannot say, in this instance, that the admission of the testimony was an abuse of discretion, especially in view of the fact that other testimony was admitted, without objection, to the effect that the deceased told others that he was injured by a crate striking him while on the railroad station platform. The cause was submitted to the jury by the trial court on the theory that the railroad company violated its duty to the deceased, and became liable to the plaintiff in the action, in that it failed to keep its depot platform reasonably safe for the deceased, and other invitees who might go there to meet the train for the purpose of becoming passengers or to meet friends coming in thereby, or to mail letters thereon, and that the injury received by the deceased was the proximate cause of his death. The issues raised by the pleadings were fairly stated to the jury in the instructions of the court, and the requested instructions of the plaintiff in error, where they correctly stated the law applicable to the issues raised by the pleadings and evidence, were covered by those instructions, and for that reason the refusal to give the requested instructions was not prejudicial error.

There is ample evidence to support the verdict, and, there being no prejudicial error of law disclosed in the record, the judgment of the trial court should be affirmed.

By the Court: It is so ordered.